UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

WENDY A. TEDESCO,

                               Plaintiff,

              -v-

I.B.E.W. LOCAL 1249 INSURANCE FUND;
EDWIN MOREIRA, JR., WILLIAM BOIRE,
CHARLES BRIGHAM, JAMES C. ATKINS,
MICHAEL GILCHRIST, and SCOTT LAMONT,
as Trustees of the Fund; and DANIEL R.
DAFOE, as Administrator of the Fund,

                               Defendants.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 28, 2015

14-cv-3367 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

       Plaintiff, a beneficiary of the IBEW Local 1249 Insurance Fund Plan ("the

Plan") since 2006, filed the instant ERISA action, seeking recovery for past and

future benefits from defendant Fund and a statutory penalty from defendant Dafoe

personally.  In this regard, she advances five claims: 1) that defendants' denial of

coverage for certain providers was a violation of Plan terms, 2) defendants'

requirement that plaintiff recertify the need for continued visits to her psychiatrist

violates the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

3) defendants' recouping of "overpayment" funds from plaintiff is an unlawful set-off

because it violates Plan terms, 4) defendants unlawfully terminated her spousal

coverage, and 5) defendant Dafoe failed to provide plaintiff requested documents

and thus should be subject to sanctions.  All but the MHPAEA claim are made

under ERISA's civil enforcement provision, 29 U.S.C. § 1132.  Defendants also filed a counterclaim seeking equitable relief to recover overpayments of benefits from plaintiff under ERISA, 29 U.S.C. § 1132(a)(3).

Plaintiff moved for summary judgment on her first and third claims. Defendant cross-moved on all affirmative claims as well as the counterclaim.

Plaintiff cannot prevail on her first cause of action regarding denial of coverage because she has not demonstrated that defendants' actions were arbitrary and capricious.  Plaintiff also fails on her third claim regarding the overpayment recoupment because she has failed to exhaust administrative remedies as required by ERISA.

On the other hand, defendants have shown that there is no genuine issue of material fact on the MHPAEA claim, as plaintiff has not demonstrated how defendants violate the statute.  Plaintiff also does not oppose defendants' motion on her fourth claim for reinstatement of benefits and fifth claim for statutory penalties under ERISA against defendant Dafoe.  Moreover, defendants have shown that plaintiff continues to be covered under the Plan, and that defendant Dafoe is not subject to the statutory penalty as a matter of law.  Defendants also prevail on the counterclaim because the Plan plainly states that the Fund is entitled to recoupment of overpayments.

For the reasons set forth below, plaintiff's motion for summary judgment is DENIED and defendants' cross-motion is GRANTED.

I.    FACTS

Plaintiff's husband is a member of the IBEW Local 1249 union.  (Pl.'s 56.1 Statement ("Pl.'s 56.1") at ¶ 9.)  The IBEW Local 1249 Insurance Fund Trustees ("Trustees") established and administers the Plan, which provides health benefit payments to about 2,000 participants and their eligible spouses and dependents. (Defs.' 56.1 Statement ("Defs.' 56.1") at ¶ 2.)  Plaintiff has been a beneficiary of the Plan since 2006.  (Pl.'s 56.1 at ¶ 9.)  Defendant Daniel Dafoe works for the IBEW Local Insurance Fund ("the Fund") and is involved in the claims process.  (Id. at ¶ 18.)

Plaintiff, a 39-year old mother of two and part-time medical assistant at White Plains Hospital, suffers from OCD and other mental illnesses.  (First Amended Compl. ("Compl.") at ¶¶ 19-20; Pl.'s 56.1 at ¶ 1; Decl. of Wendy Tedesco ("Tedesco Decl.") at ¶¶ 3, 7.)  Her OCD symptoms are severe and include fear of physical and moral contamination, skin picking, excessive cleaning, and fear of certain numbers.  (Pl.'s 56.1 at ¶ 2.)  She scored a level 36 out of a maximum level 40 on the Yale-Brown Compulsive Scale.  (Id. at ¶ 1.)  The plaintiff saw a number of mental health providers for her condition, including psychiatrist Dr. Eric Nicholson, M.D. and license social worker Shaun Levine.  (Id. at ¶¶ 4-5.)

In 2013, defendant Daniel Dafoe, the Fund's day to day administrator, initiated a review of plaintiff's claims for treatment by Levine and Nicholson.  (Pl.'s 56.1 at ¶ 27; Defs.' 56.1 at ¶ 11.)  Dafoe retained Corporate Care Management ("CCM"), an organization who has a contract with the Fund to "audit[] or review []

3

medical claims, [and] screen[] provider charges to determine whether they are reasonable," to review plaintiff's claims. (Pl.'s 56.1 at ¶¶ 26, 27.) CCM engaged Dr. David T. Anthony, M.D., a board-certified psychiatrist, to conduct the review of plaintiff's claims. (Id. at ¶ 14.) Anthony's report was based on a review conversation with Levine and an examination of plaintiff's progress notes from Levine and Nicholson. (Affirmation of Daniel R. Dafoe ("Dafoe Aff.") Ex. C, at 262-63.) Anthony concluded that continued visits with Levine were not medically necessary, and that continued visits with Nicholson were medically necessary at once per week, for 13-20 weeks, followed by monthly sessions for 3 to 6 months. (Dafoe Aff. Ex. C, at 264-64.)

On October 16, 2013, Dafoe sent a letter to plaintiff notifying her that the Plan would no longer cover visits with Levine and that it would cover "once (1) a week consultation[s] with a Psychologist\psychiatrist for 13-20 weeks followed by a monthly booster session for an additional 3-6 months." (Compl. at ¶32; Dafoe Aff. Ex. D.) The letter stated that "[a]ny variation from this would have to be approved by the Fund Office prior in consultation with its medical advisers." (Dafoe Aff. Ex. D.)

On November 7, 2013, plaintiff appealed the Trustees' determination.[1] (Pl.'s 56.1 at ¶33.) Defendants requested that CCM engage a second expert to review

---

[1]    Plaintiff also alleges that defendants' October 16, 2013 letter also informed her that payments for Nicholson's services would no longer be paid to plaintiff, but rather to Nicholson directly.  However, the Complaint does not make out a legal claim based on these facts.

plaintiff's case.  (Defs.' 56.1 at ¶ 24.)  CCM retained board-certified psychiatrist Dr. Michael A. Rater, M.D.  (Id. at ¶ 25.)  Rater's review was based on teleconferences with Levine and Nicholson, plaintiff's former psychologist Dr. Stephen Dankyo, plaintiff's former psychiatrist Dr. Arthur Badikian, as well as "[a]ll provided medical and non-medical documentation" including therapy progress notes, letters from all the providers, and a letter from plaintiff.  (Dafoe Aff. Ex. F, at 239-48.) Rater concluded that continued visits with Levine were "not medically necessary" and that "continued sessions with Dr. Nicholson are medically necessary," recommending twice-weekly visits for 16 weeks followed by reassessment for need for further treatment.  (Dafoe Aff. Ex. F, at 248-50.)  Rater's report, like Anthony's, included a conflict of interest statement.  Both experts certified that their compensation is independent of the outcome of the case and that they do not have any "material, familial, or financial conflict of interest" with plaintiff, the Fund, any of the providers, or CCM.  (Dafoe Aff. Exs. C, F.)

On January 9, 2014, the Trustees reviewed plaintiff's appeal and examined the complete record evidence from CCM, the two hired experts, and from plaintiff and her providers.  (Pl.'s 56.1 at ¶ 39; Defs.' 56.1 at ¶¶ 27-28.)  The Trustees determined that the Plan would not cover further visits to Levine because they are not medically necessary, but that it would cover twice weekly visits to Nicholson for 16 weeks, at which time an updated letter of medical necessity could be submitted for consideration.  (Dafoe Aff. Ex. G.)  Defendants informed plaintiff of the decision on January 14, 2015.  (Id.)

On January 28, 2014, the New York State Psychiatric Association wrote a letter to the Trustees, expressing concern and reservations about their determinations in plaintiff's case.  (Pl.'s 56.1 ¶ 47; Declaration of Eric Weinstein ("Weinstein Decl.") Ex. Q.)  At the end of the 16-week period, plaintiff did not submit any additional documents about the continued medical necessity of continued treatment by Nicholson.  (Defs.' 56.1 at ¶ 32.)

Plaintiff made a written request for documents related to her claim on February 20, 2014.  (Defs.' 56.1 at ¶ 33; Dafoe Aff. Ex. H.)  Defendants responded on June 6, 2014.  (Defs.' 56.1 at ¶ 34.)

On February 12, 2014, defendant Dafoe sent plaintiff with a coordination-of-benefits questionnaire to be filled out by plaintiff's employer.  (Pl.'s 56.1 at ¶ 48.)  The Fund sends the questionnaire to beneficiaries whom it believes are employed and possibly eligible for coverage by their own employers.  (Id. at ¶ 49.)  Plaintiff sent the completed form back to defendant on February 20, 2014.  (Weinstein Decl. Ex. S.)  The completed form indicated that plaintiff's employer had offered her health insurance coverage, and that her "original eligibility" date was January 1, 2013.  (Pl.'s 56.1 at ¶ 11; Weinstein Decl. Ex. S.)  Plaintiff declined the insurance offered by her employer.  (Defs.' 56.1 at ¶ 38; Weinstein Decl. Ex. S.)

Plaintiff's claims herein arise out of her husband's Insurance Fund Plan.  The Fund's Summary Plan Description ("SPD") states that the Fund provides primary health coverage for spouses and dependents who are not covered by any other insurance, and secondary coverage for spouses and dependents who are covered by

another form of insurance.  (Dafoe Aff. Ex. B, at 59.)  Moreover, spouses who opt out

of their own employers' plans are deemed "covered," and the Plan provides only

secondary coverage.  (Id. at 60.)

Dafoe informed plaintiff on March 6, 2014 that because the Fund should have

been her secondary health insurer in 2013, "[b]ills incorrectly submitted and paid

will have to be paid back to the … Fund."  (Dafoe Aff. Ex. K.)  The Fund then sent

letters to plaintiff and her medical providers who had been paid for services during

the January 2, 2013 to March 27, 2014 time frame, requesting repayment.  (Pl.'s

56.1 at ¶ 56.)  On October 8, 2014, defendant sent plaintiff an updated request for

repayment for a lower amount owed due to calculation adjustments.  (Dafoe Aff.

Ex. O.)

Plaintiff did not appeal the overpayment notice.  (Defs.' 56.1 at ¶ 41.)  To

date, she remains eligible for benefits under the Plan.  (Id. at ¶ 42.)

Plaintiff filed the instant complaint on October 7, 2013.  She advances five

claims.   First, she argues that the Trustees acted arbitrarily and capriciously and

in violation of Plan terms when they determined that the Plan would not cover

further visits to Levine and that it would cover twice weekly visits to Nicholson for

16 weeks, after which a renewed medical necessity determination would be made.

Second, she argues that the renewal requirement for treatment with Nicholson

violates the MHPAEA because the Plan does not impose similar limitations on

medical benefits.  Third, she argues that she was not overpaid and that the Fund's

actions to recoup payments from her violate Plan terms.  Fourth, plaintiff alleges

that she was terminated from the plan and seeks reversal of that termination, as well as recovery of all benefits following termination.  Finally, plaintiff claims that her requests for documents under 29 C.F.R. § 2560.503-1 were not timely responded to, and thus defendant Dafoe is liable under the sanctions provision of 29 U.S.C. § 1132(c)(1).

On November 3, 2014, defendants filed a counterclaim seeking equitable relief to enforce the overpayment recoupment provision of the Plan against plaintiff.

## II.   LEGAL STANDARD

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record placed before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the

8

true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted).  Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

III.   DISCUSSION

A.   <u>Trustees' medical necessity determinations</u>

Plaintiff's first claim is that the Trustees' two determinations—1) that plaintiff's continued visits to Levine are not medically necessary and 2) that plaintiff's visits with Nicholson are medically necessary two times per week for sixteen weeks and may only be renewed upon review of continued medical necessity—violate Plan terms.[2]  Plaintiff fails to put forward evidence suggesting that either decision was "arbitrary and capricious," the prevailing standard for this Court's review of Plan decisions.  Thus, there is no triable issue of material fact on this claim.

"Although generally an administrator's decision to deny benefits is reviewed <i>de novo</i>, where, as here, written plan documents confer upon a plan administrator

---

[2]    Plaintiff discusses two other "administrative decisions":  to reimburse plaintiff's medical directors directly instead of sending payments to her, and to withhold reimbursement to Nicholson on the grounds that he submitted two billing codes for the same visit.  (Pl.'s Summ. J. Br. 7, 24-28).  This recitation of grievances, however, do not amount to a legal claim.  Plaintiff does not connect either issue to a cause of action in her Complaint.

9

the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." <u>Hobson v. Metro. Life Ins. Co.</u>, 574 F.3d 75, 82 (2d Cir. 2009) (internal quotation marks omitted).  It is undisputed that the Trustees "determine the rules by which claims are administered and approved under the plan" (Defs.' 56.1 at ¶ 3), and both parties' briefing assume the "arbitrary and capricious" standard applies.

Under the "arbitrary and capricious" standard, courts will overturn a fiduciary's denial of benefits "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>O'Shea v. First Manhattan Co. Thrift Plan & Trust</u>, 55 F.3d 109, 112 (2d Cir. 1995) (internal citations and quotation marks omitted).  For example, a fiduciary's decision can be found arbitrary and capricious if it "impose[s] a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous." <u>Id.</u>  On the other hand, even if "both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control." <u>Id.</u>

Plaintiffs have not put forth any evidence showing that defendants' determinations were "without reason, unsupported by substantial evidence or erroneous as a matter of law."[3] <u>O'Shea</u>, 55 F.3d at 112.  It is undisputed that the

---

[3]       Plaintiffs' contention that the Trustees suffer from a conflict of interest (as both the payers of benefits and the guardian of assets) does not affect the standard of review in this case because

Trustees reviewed the "complete" record in the record during the January 9, 2014 meeting.  (Defs.' 56.1 ¶ 27, 29; Affirmation of Jules Smith Ex. A (ECF No. 33), Tr. 39:15-19.)  The record included reports by two expert physicians that the Plan engaged to evaluate plaintiff's case, letters from four of plaintiff's providers, and a letter from plaintiff herself.  (Defs.' 56.1 ¶ 28; Weinstein Decl. Ex. N, at 225.)  The Trustees' determinations were generally consistent with the recommendations of the two retained experts and plaintiff's own physicians.[4]  See Fay v. Oxford Health Plan, 287 F.3d 96, 108 (2d Cir. 2002) (declining to disturb plan fiduciary's determination of medical necessity even though it conflicted with two expert opinions to the contrary).

First, as to the trustees' determination that continued treatment by a licensed social worker was not medically necessary, Plaintiff does not dispute that the determination is consistent with the conclusions of the two outside expert physicians.  After reviewing plaintiff's medical records and speaking to her providers, Anthony and Rater both independently concluded that "Mr. Levine's services were not medically necessary."  (Compl. ¶ 66.)  In addition, submissions by

---

plaintiff has proffered no evidence that any conflict "affected the benefits decision."  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008).  In addition, the conflict of interest assertion is unsupported by the evidence.  Plaintiff does not contest that the Trustees relied on the opinions of board-certified physicians as outside experts, both of whom certified that their compensation is independent of the outcome of the case, and do not have any material relationship with the patient or insurer.  (Dafoe Aff. Exs. C, F.)

[4]      Plaintiff argues that the two retained experts' conclusions are impermissible "legal opinion." Plaintiff presents no evidence for the assertion that the doctors are making legal, rather than medical, conclusions.  Both doctors' reports cite only to medical journals, textbooks, and manuals. (Dafoe Aff. Ex. C, F.)  Plaintiff also cites no authority for the proposition that the doctors' conclusions are impermissible.

plaintiff's psychiatrists and psychologist (Nicholson, Badikian and Dankyo) do not state that Levine's services were medically necessary.  (Weinstein Decl. Ex. K, at 280-286.)  Although Nicholson apparently reported to Rater that he "feels she needs the social worker to for support for her to be able to maintain contact with the . . . psychologist," Nicholson never states that he believes Levine's services are medically necessary, or specifically recommends continued visits to Levine. (Weinstein Decl. Ex. L, at 243; Ex. K, at 283.)  Only plaintiff's and Levine's own letters specifically discusses the medical necessity of continued treatment by Levine.  (Weinstein Decl. Ex. K, at 277-79, 287-88.)

Plaintiff also does not put forth any evidence supporting an inference that the Trustees' ultimate decision as to the medical necessity of treatment by Nicholson was arbitrary and capricious.  The determination was in fact based on recommendations of plaintiff's treating physician and the engaged experts.  The Trustees determined that treatment by a psychiatrist or psychologist up to twice a week was for 16 weeks was medically necessary.[5]  The Trustees added that coverage of continued treatment after the 16 weeks is possible upon submission of medical records, treatment plan, and an updated letter of medical necessity.  (Dafoe Aff. Ex. G.)  The Trustee's determinations are clearly in line with recommendations from plaintiff's current treating psychiatrist Nicholson stating that plaintiff should

---

[5]     Plaintiffs argue that the Trustees did not consider an additional ground for denying benefits – denials on the basis that the "treatment [was] not recommended and approved by a physician" – and therefore have waived it as a defense under ERISA.  (Pl.'s Reply & Opp. Br. 4-5.)  Because defendants have stated that they are not raising this defense, it is not relevant for the Court's consideration.

"continue once or twice weekly sessions with a Board-Certified . . . Psychiatrist . . . ." (Weinstein Decl. Ex. K, at 283.)  Although Nicholson also stated that the treatment should last "far longer than 20 weeks of once weekly treatment," the Trustee's requirement of review after 16 weeks does not preclude continued treatment.  As to the psychiatrists engaged by defendants, one (Anthony) concluded that therapy by a psychologist should be "weekly for 13-20 weeks followed by monthly booster sessions for 3-6 months" and the other (Rater) recommended treatment by Nicholson "twice weekly for the next sixteen weeks, with a reassessment at that time of efficacy and further treatment needed."  (Dafoe Aff. Exs. C, F.)[6]  The Trustees' determinations are based on the medical evidence and recommendations of experts, and thus are not arbitrary and capricious as a matter of law.

Finally, Plaintiff's assertion that the Trustees erroneously used a "test of efficacy" instead of medical necessity to limit her treatment with Nicholson is not supported by any evidence.  Plaintiff bases her contention on Rater's statement that at 16 weeks, there should be "a reassessment . . . of efficacy and further treatment needed." (Dafoe Aff. Ex. C.)  Rater's own statement of "further treatment needed" incorporates the medical necessity standard.  (Id.)  Plaintiff also presents no evidence that the Trustees "adopted [an] efficacy opinion" instead of using a medical

---

[6]     Badikian and Levine's letters did not recommend a specific course of treatment.  (Weinstein Decl. Ex. K, at 284, 287-88)  Dankyo recommended "ERP sessions 3 times per week … over the course of the next several months" and "supportive psychotherapy one time weekly in addition to ERP."  (Weinstein Decl. Ex. K, at 286.)

necessity standard.  The Trustees determined that a twice-weekly psychiatric visits are medically necessary.  It also instituted a recertification process based on "an updated letter of medical necessity," with no mention of efficacy.[7]  (Dafoe Aff. Ex. G.)

B.   MHPAEA claim

Plaintiff has presented no evidence indicating that the Fund imposes a more stringent limitation on mental health benefits than on medical and surgical benefits, and thus has failed to raise an issue of material fact as to her MHPAEA claim.  The MHPAEA requires that for plans that provide both medical / surgical benefits and mental health or substance use disorder benefits,

> the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a.  The MHPAEA's implementing regulations state that where mental health and medical benefits determinations are both subject to the same "evidentiary standards . . . based on recommendations made by panels of experts" with adequate training and experience and applying "clinically appropriate standards," such a scheme conforms to the statute.  45 C.F.R. § 146.136.  This is so

---

[7]     Plaintiff also offers no rationale for why she did not submit an updated medical necessity letter at the conclusion of the 16-week period.  (Compl. at ¶37.)

even if the result is dissimilar "number of visits [or] days of coverage" for medical versus mental health claims.  Id.

Plaintiff submits no admissible evidence in favor of its assertion that the benefit limitations that the Trustees imposed on her mental health treatment are more stringent than limitations on medical benefits.  The SPD requires the medical necessity standard for all benefit claims, not just mental health claims.  (Dafoe Aff. Ex. B, at 64.)  Plaintiff also proffers no evidence that the Fund uses different evidentiary standards in medical necessity determinations for non-mental health claims.[8]

The only evidence plaintiff submits in favor of her position, a January 28, 2014 letter from the New York Psychiatric Association, does not raise a genuine issue of material fact.  Indeed, the letter merely states that "if the Fund's 16-week medical necessity requirement is imposed unilaterally on mental health or substance use disorder benefits, that would likely represent a violation of the MHPAEA."  (Weinstein Decl. Ex. Q (emphasis added).)  This is not evidence that defendants impose disparate requirements for mental health versus medical treatments in violation of the MHPAEA.

C.    Plaintiff's unlawful set-off claim

Plaintiff's third claim—that the Fund unlawfully requested the return of funds and refused to pay further benefits on the grounds that plaintiff has been

---

[8]    As noted previously, plaintiff's argument about "efficacy" is unsupported by the record evidence.

15

overpaid benefits—must also fail.  Plaintiff has not met the threshold requirement of exhausting her administrative remedies.  (Answer & Countercl. 15.)  It is well-established that in order to bring an ERISA claim for benefits in federal court, a plaintiff must have exhausted the administrative review procedures established by her insurance carrier.  See Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 511 (2d Cir. 2002) ("[C]laimants must pursue all administrative remedies provided by their plan pursuant to statute, which includes carrier review in the event benefits are denied.").  The only exception to this rule is if a plaintiff "make[s] a clear and positive showing that pursuing available administrative remedies would be futile."  Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 133 (2d Cir. 2001) (internal citations and quotation marks omitted).

It is undisputed that plaintiff did not appeal the Trustees' March 2014 letter informing plaintiff that she and her providers had been overpaid and that overpayments not paid to the Fund back would be deducted from future benefits. (Weinstein Decl. Ex. T; Defs.' 56.1 ¶ 41.)  Plaintiff's futility argument, based on her assertion that administrative remedies were unavailable because the deduction provision is a "set-off" and not an "adverse benefit determination" under the SPD, is unavailing.  She has proffered no facts in support of this position.  The SPD defines an adverse benefit determination as "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for a benefit, including any such denial, reduction, or failure to provide or make payment that is based on a determination of a participant's eligibility to participate in this plan."  (Dafoe Aff.

Ex. B, at 27.)  Based on this language, defendants may well have interpreted the overpayment "set-off" as a "reduction" of future benefits, and therefore an adverse benefit determination subject to appeal.  Thus, plaintiff has made no clear showing that an appeal would have been futile.

Finally, plaintiff cannot rest on the contention that "any appeal to the trustees would have been futile, particularly in the middle of this litigation."  The insurer's "position in this lawsuit does not establish futility."  Davenport, 249 F.3d at 134.

> ### D.  Defendants' overpayment counterclaim
>
> #### i.  Subject matter jurisdiction

Defendants bring their counterclaim under a provision of ERISA, 29 U.S.C. § 1132(a)(3), which allows recovery

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

Because there is no dispute that Trustee defendants are fiduciaries of the Fund, and because the relief defendants seek is equitable, this Court has subject matter jurisdiction over the counterclaim.

Plaintiff's sole argument in opposition to defendants' motion is that this Court lacks subject matter jurisdiction because defendants seek monetary, not equitable, relief.  This is plainly incorrect.  Courts have addressed this issue previously and have found against plaintiff's position.  Defendants seek recovery of

specific funds: namely, the benefit payments to plaintiff from January 1, 2013 to March 27, 2014, a period during which plaintiff could have elected health insurance coverage from her own employer.  The Supreme Court has held that recovery of specific funds is different from seeking general, "personal liability . . . for a contractual obligation to pay money."  Sereboff v. Mid Atlantic Med. Svcs., 547 U.S. 356, 362 (2006) (internal quotation marks omitted).  Defendants' claim is therefore in the nature of equitable, not legal, recovery.

That plaintiff did not keep her benefit payments in a separate fund and may have spent those assets, however, does not change the equitable nature of plaintiff's claim.  In Thurber v. Aetna Life Insurance Co., 712 F.3d 654, 656-58 (2d Cir. 2013), the Second Circuit held that § 1132(a)(3) requires neither fund segregation nor current possession as long as the plan put the beneficiary "on notice" that "she would be required to reimburse the insurer" and "that the funds under her control belonged to the insurer."  Id. at 663-64.

Defendants put plaintiff "on notice" that it will not cover the benefit amounts that her own employer's health insurance plan would have paid had she elected it. The SPD states,

> [W]here a spouse makes a **voluntary election out of their employer's Group Plan**, this Plan will treat the spouse **as if they were covered** by their employer's plan.  As a result, there will be subtracted, from what this Insurance Fund would have paid on a spouse's or dependent's claim, any amount that would have been paid by the spouse's employer's Plan if they had not elected to not be covered.

(Dafoe Aff. Ex. B, at 60) (emphasis in original).

18

In addition, the SPD gave plaintiff clear notice that the Trustees would require reimbursement in cases of overpayment:

> [T]he <u>Trustees have the right to recover any overpayment</u> or mistaken payment made to you or to a third party.  The claimant, third party, or other individual or entity, receiving the overpayment or mistaken payment must pay back the overpayment or mistaken payment to the Fund with interest a 2% per month.  <u>Such a recovery may be made by reducing other benefit payments</u> made to or on behalf of the claimant (you) or your spouse or dependents, <u>by commencing a legal action or by such other methods</u> as the Trustees, in their discretion, determine to be appropriate.

(<u>Id.</u> at 73) (emphasis added).

Thus, defendants have met the notice requirement under <u>Thurber</u> for equitable claims.  Accordingly, the Court has subject matter jurisdiction over defendants' counterclaim under 29 U.S.C. § 1132(a)(3) to the extent that it seeks equitable recovery for monies overpaid to plaintiff.[9]

---

[9]      Defendants' March 27, 2014 and October 8, 2014 letters to plaintiff requests repayment for only the amounts that were overpaid to plaintiff directly.  (Dafoe Exs. L, O.)  However, the letters also note that plaintiff "will be responsible for any monies not collected from" providers who were paid directly by the Plan.  To the extent that defendants seeks recovery from plaintiff funds not recouped from her providers, that recovery does not fall under the category of equitable relief.  <u>See Central States, S.E. & S.W. Areas Health & Welfare Fund v. Gerber Life Ins. Co.</u>, 771 F.3d 150, 157 (2d Cir. 2014) (holding that "only a beneficiary who was a party to an agreement with the plan and thus has taken on a duty to repay the funds to the plan, holds such funds in constructive trust for the plan" and that a claim against another insurance company is not an equitable one).  Plaintiff was not put on notice that she would be personally liable for overpayments to third parties.  (<u>See</u> Dafoe Aff. Ex. B, at 73 (stating only that "[t]he claimant, third party, <u>or</u> other individual or entity, <u>receiving</u> the overpayment or mistaken payment must pay back the overpayment or mistaken payment") (emphasis added)).  Thus, this Court does not have jurisdiction over any claims for recovery of third-party overpayments under 29 U.S.C. § 1132(a)(3).

ii.     <u>Merits of the counterclaim</u>

Plaintiff has raised no genuine issue of material fact that would preclude defendant from obtaining equitable relief on its counterclaim.

a.  The Plan as secondary coverage

The plain language of the SPD is clear:  when a spouse beneficiary refuses coverage from her own employer, the Plan will "treat the spouse as if they were covered by their employer's plan" and "subtract . . .  the amount that would have been paid by the spouse's employer's Plan if they had not elected to not be covered." (Dafoe Aff. Ex. B at 60).  It is undisputed that plaintiff declined health insurance coverage offered by her own employer.  (Compl. ¶ 83; Defs.' 56.1 ¶ 38.)

Plaintiff cites an IBEW union newsletter characterizing the SPD as incorporating "a series of rules agreed upon by the Insurance Commissioner of all 50 states" (plaintiff states that this refers to the National Association of Insurance Commissioners' Coordination of Benefits Model Regulations, which prohibits reductions of benefits on the basis that a claimant did not enroll in her own employer's plan) as evidence that defendant acted arbitrarily and capriciously and contradicted their published position.  (Tedesco Decl. Ex. A.)  However, plaintiff does not proffer any facts to support its assertion that the Fund or the Trustees published the union newsletter, or adopted its contents as the Fund's own position. In fact, plaintiff agrees that the newsletter is published by "Local Union 1249." (Pl.'s 56.1 at ¶ 52.)

20

In all events, the contents of the newsletter cannot amend the SPD.  The SPD reserves the rights to amend to the Trustees only, and not to the union.[10]  See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 79 (1995) (holding that where the employee plan document reserved amendment rights to a specific entity, the rights are reserved for that entity, and "not to any union, not to any third-party trustee, and not to any of the other kinds of outside parties that, in many other plans, exercise amendment authority").

The SPD states:

> The Booklet and written information from the Trustees and the Plan Office Personnel are your only authorized sources of Plan information. The Trustees of the Plan have not empowered anyone else to speak for them with regard to the Insurance Plan.  No employer, union representative, supervisor, or shop steward is in a position to discuss your rights under this Plan with authority.

(Dafoe Aff. Ex. B, at 12.)  Plaintiff does not dispute that the SPD governs the rules of the Plan and that the defendant Trustees "determine the rules by which claims are administered and approved under the Plan."  (Defs.' 56.1 at ¶ 3.)  Because the SPD is clear that no other sources—including the union—have authority to "speak for" the Plan, plaintiff's argument fails.[11]

Furthermore, the very same page of the newsletter warns that the Plan will not "pick up the spouses and dependents in primary coverage if they drop the other

---

[10]     The Fund's board of trustees consists of representatives not only from the union, but also employers.  (See Dafoe Aff. Ex. B, at 9.)

[11]     This Court also requested supplemental briefing from the parties as to the applicability of New York State Insurance Regulation 11 N.Y.C.R.R. 52.23 to this argument.  The parties agree that the regulation is preempted by ERISA and thus does not bind defendants.

coverage" and that it will only serve as "the SECONDARY COVERAGE, NEVER the primary" when "a spouse makes a voluntary election out of their Employers Group Plan." (Id.)  Because all available evidence shows that the newsletter is not authored by defendants, and because it reinforces—rather than contradicts—the Plan rules, defendants did not act arbitrarily and capriciously in denying plaintiff benefits according to the SPD's coordination of benefits policy.

### b.  Defendants' authority to recover

There is also no genuine material dispute about defendants' authority to "recover any payment or mistaken payment," which is clearly articulated in the SPD.  (Dafoe Aff. Ex. B, at 73).  Because the Fund mistakenly paid plaintiff benefits without knowledge that the IBEW Plan should have been the secondary, not primary, coverage, it is entitled to recover the payment directly or by reducing benefits from plaintiff.  (Id.)

Plaintiff argues that the Fund does not have authority to recover because it "assumed the risk," as it knew that plaintiff was employed.  Yet it is undisputed that plaintiff's employer began offering her coverage on January 1, 2013.  (Pl.'s 56.1 ¶11; Weinstein Decl. Ex. S (noting "original eligibility" on January 1, 2013).) Defendant sent the coordination of benefits update form to plaintiff on February 12, 2014.  (Weinstein Decl. Ex. R.)  Plaintiff does not allege any facts suggesting that defendant knew or should have known that plaintiff had been offered, and declined, insurance from her own employer prior to receiving the completed coordination of benefits form on February 20, 2014.  (Weinstein Decl. Ex. S.)  Therefore, defendants

have demonstrated that there is no genuine dispute on any material fact as to the overpayment counterclaim.

### E.   Plaintiff's Plan termination

Plaintiff do not oppose defendants' motion for summary judgment on the Fourth Cause of Action, "Unlawful Termination of Coverage."  It is undisputed that plaintiff remains eligible for benefits.  (Defs.' 56.1 at ¶ 42.)  Thus, defendants are entitled to summary judgment on this cause of action.  See Fed. R. Civ. P. 56(e)(3).

### F.   Plaintiff's request for information from Dafoe

Plaintiff also do not oppose defendants' motion for summary judgment on the Fifth Cause of Action for sanctions under ERISA.[12]  In any event, plaintiff is not entitled to sanctions as a matter of law because the documents that she alleges were not timely provided to her are not covered under the sanctions statute, 29 U.S.C. § 1132(c)(1).

The relief that plaintiff seeks—personal penalties against defendant Dafoe up to $100 per day of violation—is only available for failures "to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary."  29 U.S.C. § 1132(c)(1)(B). ERISA requires that the plan administrator provides beneficiaries with "the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments

---

[12]     The Court reviews the motion pursuant to Fed. R. Civ. R. 56(c)(3), and considers the facts set forth by defendants as undisputed.  (See Dafoe Aff. ¶ 25-26.)

under which the plan is established or operated" upon request.  29 U.S.C. § 1024.

See also Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d

139, 144 (2d Cir. 1997) (noting that § 1024 "in no way suggest[s] that the

information to which plan participants are entitled is unlimited").

Plaintiff does not suggest that she requested those enumerated documents.

Instead, she only alleges that Dafoe failed to comply with ERISA regulations, 29

C.F.R. § 2560.503-1, by not timely providing her with copies of her own file.  (Compl.

at ¶106, 109.)  However, plaintiff does not claim that defendant violated any

statutory provision of ERISA that requires timely furnishing of information.

Section 1132(c)(1) does not cover "alleged violations of ERISA's implementing

regulations."  Gates v. United Health Grp. Inc., No. 11 Civ. 3487 KBF, 2012 WL

2953050, at *12, n.15 (S.D.N.Y. July 16, 2012) (citing Wilczynski v. Lumbermens

Mut. Cas. Co., 93 F.3d 397, 406-07 (7th Cir. 1996) and Groves v. Modified Ret. Plan

for Hourly Paid Emps. of Johns Manville Corp. & Subsidiaries, 803 F.2d 109, 117

(3d Cir. 1986)).  As plaintiff has alleged no violations covered under the statute, she

is not entitled to sanctions.

IV.    CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is

DENIED and defendants' motion for summary judgment is GRANTED.  The Clerk

24

of Court is directed to terminate the motions at ECF Nos. 26 and 31 and to terminate this action.

      SO ORDERED.

Dated:      New York, New York
              October 28, 2015

_____
      KATHERINE B. FORREST
      United States District Judge