UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
WENDY A. TEDESCO,

                        Plaintiff,

      -against-

I.B.E.W. LOCAL 1249 INSURANCE FUND; EDWIN
MOREIRA, JR., WILLIAM BOIRE, CHARLES
BRIGHAM, JAMES C. ATKINS, MICHAEL
GILCHRIST, and SCOTT LAMONT, as Trustees of
the Fund; and DANIEL R. DAFOE, as Administrator
of the Fund,

                        Defendants.
-----------------------------------------------------------------X

**OPINION & ORDER**

14-CV-3367 (CS)

Appearances:

Eric Weinstein
Ellenoff Grossman & Schole LLP
New York, New York
*Counsel for Plaintiff*

Jules L. Smith
Daniel R. Brice
Blitman & King LLP
Rochester, New York
*Counsel for Defendants*

Seibel, J.

      Before the Court is Plaintiff's motion for attorney's fees.  (Doc. 125.)

## I.     BACKGROUND

      Plaintiff is a beneficiary of the IBEW Local 1249 Insurance Fund ("the Fund") Plan ("the

Plan"), through her husband who is a member of Local 1249.  (Doc. 104 ("SJ Order II") at 1, 4.)

She filed the instant action under the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1001, *et seq*., in 2014 seeking, among other things, recovery for past and future benefits

under the Plan and an order prohibiting Defendants from setting-off previous overpayments

against future payments.  (*Id.* at 1; *see* Doc. 9 ("FAC") ¶¶ 51-75, 81-96.)

Plaintiff, a mother of two and part-time medical assistant, suffers from Obsessive-Compulsive Disorder ("OCD") and other mental illnesses.  (SJ Order II at 4.)  Her OCD symptoms are severe and include fear of physical and moral contamination, skin picking, excessive cleaning, and fear of certain numbers.  (*Id.*)  She scored a level 36 out of a maximum level 40 on the Yale-Brown Compulsive Scale.  (*Id.*)  Plaintiff saw a number of mental health providers for her condition, including psychiatrist Eric Nicholson, M.D., and licensed social worker Shaun Levine.  (*Id.*)

In 2013, Defendant Daniel Dafoe, the Fund's day-to-day administrator, initiated a review of Plaintiff's claims for treatment by Dr. Nicholson and Levine.  (*Id.*)  The Fund retained Corporate Care Management ("CCM"), an organization that has a contract with the Fund, to review Plaintiff's claims.  (*Id.*)  CCM engaged David T. Anthony, M.D., a board-certified psychiatrist, who conducted a review of Plaintiff's claims, had a conversation with Levine, and examined Plaintiff's progress notes from Levine and Dr. Nicholson.  (*Id.*)  Dr. Anthony did not speak with Dr. Nicholson.  (*Id.*)[1]  Dr. Anthony acknowledged that Plaintiff has severe OCD and that visits with Levine were useful in providing support, but he concluded such visits were not medically necessary because the type of services that Levine provided do not treat the more acute symptoms of OCD and target behavior that was not likely to improve.  (*Id.* at 21-22.)  Dr. Anthony concluded that continued visits with Dr. Nicholson were medically necessary once per

---

[1] Dr. Anthony called Dr. Nicholson on October 9 and 10, 2013, and left messages.  (Doc. 95 ("Kim Decl.") Ex. 3 at A-26.)  Dr. Nicholson left Dr. Anthony a message on October 11 saying he would not be available to speak until October 16.  (*Id.* Ex. 3 at A-27.)  Dr. Anthony tried calling Dr. Nicholson back on October 11 but could not reach him.  (*Id.*)  Dr. Anthony made his recommendation on October 11 and issued his report on October 15 without speaking to Dr. Nicholson.  (*Id.* Ex. 3 at A-20, A-26-A-27.)

week, for thirteen to twenty weeks, followed by monthly sessions for three to six months. (*Id.* at 22.)

On October 16, 2013, Dafoe sent a letter to Plaintiff notifying her that the Plan would no longer cover visits with Levine and that it would cover "once (1) a week consultation[s] with a Psychologist\psychiatrist for 13-20 weeks followed by a monthly booster session for an additional 3-6 months." (*Id.* at 5; Kim Decl. Ex. 4). The letter stated that "[a]ny variation from this would have to be approved by the Fund Office prior in consultation with its medical advisors." (*Id.*)

On November 7, 2013, Plaintiff appealed the Fund's determination. (SJ Order II at 5.) Plaintiff included with her appeal letters from herself, Dr. Nicholson, Levine, Plaintiff's former psychologist Dr. Stephen Dankyo, and Plaintiff's former psychiatrist Dr. Arthur Badikian. (*Id.*) The Fund requested that CCM engage a second expert to review Plaintiff's case. (*Id.*)

CCM retained board-certified psychiatrist Michael A. Rater, M.D., who prepared a report based on phone conferences with Levine, Dr. Nicholson, Dr. Dankyo, and Dr. Badikian, as well as medical and non-medical documentation including therapy progress notes, the letters from the providers, and the letter from Plaintiff. (*Id.*). Dr. Rater also acknowledged that Plaintiff has severe OCD. (*Id.* at 22) He added that, according to certain peer-reviewed literature, psychodynamic psychotherapy (the services Levine provides) can help a person sort out conflicts in important relationships or explore the history behind symptoms, though insight itself is not likely to have an impact on severe symptoms. (*Id.*) Dr. Rater also stated that the American Psychiatric Association practice guidelines for the treatment of OCD provide that psychodynamic psychotherapy may be useful in working on a patient's resistance to treatment, but he concluded that psychotherapy "*alone* has generally not been found to be helpful in

ameliorating OCD symptoms," (Kim Decl. Ex. 8 at A-59 (emphasis added)), seemingly ignoring

the fact that Plaintiff was also receiving treatment from Dr. Nicholson. In any event, Dr. Rater

concluded that continued visits with Levine were "not medically necessary," but "continued

sessions with Dr. Nicholson are medically necessary," recommending twice-weekly visits for

sixteen weeks followed by reassessment of the need for further treatment. (*Id*. Ex. 8 at A59-61.)

On January 9, 2014, the Trustees reviewed Plaintiff's appeal and examined the record

from the two CCM experts, Plaintiff, and her providers. (SJ Order II at 6.) The Trustees

determined that the Plan would not cover further visits to Levine because they were not

medically necessary but that it would cover twice weekly visits to Dr. Nicholson for sixteen

weeks, at which time an updated letter of medical necessity could be submitted for consideration.

(*Id.*) Defendants informed Plaintiff of the decision on January 14, 2014. (*Id.*) At the end of the

16-week period, Plaintiff did not submit any additional documents about the continued medical

necessity of treatment by Dr. Nicholson. (*Id.*)

In addition, the Fund had erroneously paid previous medical bills of Plaintiff as if it was

the primary insurer, but under the terms of the Plan, it should have paid a lower amount as the

secondary insurer because Plaintiff had declined to be covered by her own employer's health

plan. (Doc. 50 ("SJ Order I") at 22.) The Fund advised Plaintiff that it was entitled to recoup

these overpayments or set them off against future claims. (Doc. 29 Ex. T.)

## II.   PROCEDURAL HISTORY

Plaintiff filed her first amended complaint in this action in October 2014, advancing four

claims under ERISA – (1) the Fund's violation of the Plan's terms by denying medically

necessary visits to Dr. Nicholson and Levine, (2) the Fund's lack of a right to any future offset of

benefits based on the erroneous overpayments, (3) the Fund's unlawful termination of coverage,

and (4) Defendant Dafoe's failure to provide information as required by ERISA – as well as one

claim alleging the Fund's violation of the Mental Health Parity and Addiction Equity Act of 2008 by making Plaintiff re-establish the medical necessity of visits to Dr. Nicholson after sixteen weeks of treatment. (*See* FAC.) Defendants answered and asserted a counterclaim to recover the alleged overpayments. (Doc. 10.) On July 10, 2015, the parties cross-moved for summary judgment. (Docs. 26, 31.) On October 28, 2015, Judge Forrest granted Defendants' motion in its entirety, dismissing all of Plaintiff's claims and granting judgment to Defendants on their counterclaim, (SJ Order I), leaving only the issue of damages on Defendants' counterclaim to be litigated, (*see* Doc. 77 at 1). After the Court's decision, but before entry of judgment (and Plaintiff's appeal), Defendants moved to voluntarily dismiss their counterclaim pursuant to Federal Rule of Civil Procedure 41(a)(2). (*Id.*) At the time, Defendants explained that they sought voluntary dismissal because of the Supreme Court's decision in *Montanile v. Board of Trustees of the National Elevator Industry Health Benefit Plan*, 136 S. Ct. 651, 662 (2016), which held that an ERISA fiduciary may not bring suit to attach a participant's general assets.

Plaintiff then appealed Judge Forrest's decision to the Second Circuit as to two claims: the denial-of-benefits claim and the offset claim. (SJ Order II at 6-7.) On appeal, the Second Circuit affirmed dismissal of Plaintiff's offset claim, but remanded the denial-of-benefits claim due to an intervening decision, *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*, 819 F.3d 42 (2d Cir. 2016), which held that "'a plan's failure to comply with the Department of Labor's claims-procedure regulation will result in that claim being reviewed *de novo* in federal court, unless the plan . . . can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless.'" (Doc. 83 ("2d Cir. Summary Order I") at 3 (quoting *Halo*, 819 F.3d at 58) (emphasis in original) (citation omitted).) Because the Fund's adverse-benefit notifications to Plaintiff did not comply

with Department of Labor regulations – in that they provided neither "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request," 29 C.F.R. § 2560.503-1(g)(1)(v)(B) – and because Judge Forrest's review had been under the arbitrary-and-capricious standard rather than *de novo*, remand was necessary, (2d Cir. Summary Order I at 3). The Second Circuit also found that Plaintiff's overpayment/setoff claim "fail[ed] on the merits" and that Defendants "have the right to recover, through setoff, any benefit overpayments, meaning any amount that would have been paid by [Tedesco's] employer's Plan if [she] had not elected to not be covered." (*Id.* at 5-6 (internal quotation marks omitted and alterations in original).) In addition, despite Defendants having dropped their counterclaim, the Second Circuit "remand[ed] for the district court to determine the amount of money the Fund is entitled to recover." (*Id.* at 6.)

Following the Second Circuit's order, the parties rebriefed cross-motions for summary judgment. (Docs. 87, 91.) In Defendant's motion, they requested, among other things, that the court "issue a determination regarding the amount the Defendants are entitled to recover pursuant to off-set," despite having previously withdrawn their counterclaim. (Doc. 88 at 19.)

Judge Forrest issued her second summary judgment order on August 21, 2017, finding that Plaintiff's adverse-benefit determination was subject to *de novo* review, (SJ Order II at 12), and under that standard, concluding that Defendant's "adverse-benefit determination with regards to Dr. Nicholson was correct as a matter of law," (*id.* at 23). With regard to treatment by Levine, the court held that "[a]lthough the evidence appears to favor [P]lainitff's position, final determination is inappropriate at the summary judgment stage" because Second Circuit precedent required a trial where there was competing expert opinion evidence, even though all parties' experts seemingly supported Plaintiff's position. (*See id.* at 24, 27.) The court also held

that it did not have jurisdiction to determine the amount of money the Fund was entitled to recover based on the overpayments because Defendants had voluntarily withdrawn their counterclaim and there was no live claim for the Court to adjudicate. (*See id.* at 28.) The parties then settled the remaining claim relating to Levine's services. (Doc. 110.)

On October 5, 2017, Plaintiff moved for attorney fees in connection with this action, (Doc. 113), and on October 20, 2017, Judge Forrest denied Plaintiff's motion, (Doc. 118).

Plaintiff then appealed Judge Forrest's second summary judgment order and order denying attorney's fees. (*See* Doc. 121 ("2d Cir. Summary Order II") at 2.) The Second Circuit held that the district court correctly concluded that it did not have jurisdiction to determine the amount the Fund was entitled to set off, because Defendants had already voluntarily dismissed their counterclaim and the Circuit's previous remand was of that counterclaim, not – as Plaintiff argued – of her claim that she had not been overpaid. (*Id.*)

The Second Circuit vacated, however, the order denying attorney's fees. (*Id.* at 4.) It explained that "'[w]hether a plaintiff has obtained some degree of success on the merits is the sole factor that a court *must* consider in exercising its discretion' to award fee under Section 1132." (*Id.* at 3 (quoting *Donachie v. Liberty Life Assurance Co. of Bos.*, 745 F.3d 41, 45 (2d Cir. 2014) (emphasis in original).) Applying the "some success" standard to the instant case, the court held that "[t]o the extent the district court's doubt about Tedesco's success amounted to a legal determination that the parties' settlement following our remand and the district court's subsequent denial of summary judgment to [D]efendants on part of Tedesco's denial-of-benefits claim was not 'some success,' it was an error of law." (*Id.*) The Second Circuit also faulted the district court for "fail[ure] to consider whether the Fund exhibited at least some degree of culpability in light of its reliance on two psychiatrists who failed to consult with the treating

7

psychiatrist and its failure to comply with ERISA's requirements for explaining its decisions."
(*Id.* at 4.)  On remand, the district court was instructed to "consider whether this level of
culpability, combined with Tedesco's partial success on the merits and the Fund's admitted
ability to pay weighs in favor of granting attorney's fees."  (*Id.*)

On August 20, 2018, Plaintiff filed another motion for attorney's fees, (Doc. 125), and a
memorandum of law in support, (Doc. 126 ("Mem."))[2]  On September 20, 2018, Defendants
filed their opposition to Plaintiff's motion, (Doc. 131 ("Opp.")), and on September 27, 2018,
Plaintiff filed a reply, (Doc. 133)[3]

## III.  DISCUSSION

The district court has discretion under Section 502(g)(1) of ERISA to award attorney's
fees and costs to either party.  29 U.S.C. § 1132(g)(1); *Chambless v. 39 Masters, Mates & Pilots
Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987), *abrogation on other grounds recognized by
Levitian v. Sun Life & Health Ins. Co.*, 486 F. App'x 136 (2d Cir. 2012).  As stated above, the
only factor that a court *must* consider in determining whether to award fees under § 1132 is
whether a party obtained "some degree of success on the merits."  *Donachie*, 745 F.3d at 46.
Courts also have discretion to "consider five additional factors in deciding whether to award
attorney's fees."  Those five factors, also known as the *Chambless* factors, are:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the
> offending party to satisfy an award of attorney's fees, (3) whether an award of fees
> would deter other persons from acting similarly under like circumstances, (4) the
> relative merits of the parties' positions, and (5) whether the action conferred a
> common benefit on a group of pension plan participants.

---

[2] Plaintiff moved for fees only against the Fund, not the individual Defendants, (Doc. 126 at 1
n.1), but all of the Defendants opposed Plaintiff's motion for fees, (*see* Doc. 131 at 1 n.1).

[3] On September 14, 2018, while the instant motion was pending, the case was reassigned to the
undersigned.

*Chambless*, 815 F.2d at 871.

### A.    Some Success on the Merits

A party does not satisfy the "some success" requirement by achieving

> trivial success on the merits or a purely procedural victory, but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue.

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (internal quotation marks and alterations omitted).

Plaintiff argues that she has achieved some success on her first cause of action.  (Mem. at 5).  I agree.  First, the Second Circuit's remand directed this Court to consider whether Defendants' level of culpability and ability to pay "combined with Tedesco's partial success on the merits . . . weighs in favor of granting attorney's fees," establishing that it considers this issue decided.  (2d Cir. Summary Order II at 4.)  Second, even had the Second Circuit not spoken, I would find some success.  Judge Forrest, in her second summary judgment order, stated that "the evidence appears to favor [P]lainitff's position," but that she was bound to try the case because "'it is inappropriate for a court to grant summary judgment where the resolution of an ERISA benefits dispute entails adopting one medical expert's opinion over another.'"  (SJ Order II at 26 (quoting *Tretola v. First Unum Life Ins. Co.*, No. 13-CV-231, 2015 WL 509288, at *23 (S.D.N.Y. Feb. 6, 2015)); *see id.* at 3, 17, 24.)  Following that order, in which Judge Forrest suggested repeatedly that Plaintiff had the more meritorious position, the parties settled the claim.

Under what is known as the "catalyst theory," "[w]here. . . the parties already have received a tentative analysis of their legal claims within the context of summary judgment, a party may be able to show that the court's discussion of the pending claims resulted in the party

obtaining relief." *Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 155 (2d Cir. 2013). Judge

Forrest's decision clearly favoring Plaintiff's claim is just the scenario contemplated by

*Scarangella*, in which the court's tentative analysis of a party's legal claims in an order denying

summary judgment likely resulted in a party obtaining relief through settlement or voluntary

dismissal. *See id.* Indeed, the Second Circuit adopted that reasoning in this case, explaining that

the district court committed an "error of law" to the extent it found that Plaintiff did not achieve

some success on the merits where the parties settled following denial of Defendants' summary

judgment motion on that issue. (2d Cir. Summary Order II at 3.) Accordingly, Plaintiff has

achieved some success on the merits on its first claim.

Plaintiff next argues that she achieved some success on the merits of her third cause of

action – which sought a court order that Plaintiff was entitled to all future benefit payments

without any offsets based on earlier overpayments – because Defendants voluntarily withdrew

their counterclaim seeking return of $33,000 in overpayments. (Mem. at 5-7.) Plaintiff cites to

*Scarangella* to support its argument that "withdrawal of [a] counterclaim constitutes at least

partial success on the merits." (*Id.* at 6 (citing *Scarangella*, 731 F.3d at 152).) But *Scarangella*

does not help Plaintiff here. The court there held that a party that obtains relief due to the

voluntary conduct of another party may be able to show some success on the merits, but only

where a court has provided an analysis that was the impetus for the voluntary dismissal.

*Scarangella*, 731 F.3d at 155 (suggesting that the party seeking fees must "demonstrate[] that the

impetus for the relief was some action by the court," such as "a tentative analysis of their legal

claims within the context of summary judgment" or "a remand order opining positively on the

merits of the plaintiff's claim"). Here, Plaintiff has not pointed to any action by the court that

was an impetus for Defendants to withdraw their counterclaim. In fact, the only time the court

analyzed Defendants' counterclaim, it granted summary judgment on it in favor of *Defendants*, (SJ Order I at 20-21), and ruled that Plaintiff's third cause of action "must also fail," (*id.* at 15-16), both of which rulings were affirmed on appeal, (2d Cir. Summary Order I at 4 ("Tedesco's overpayment claim . . . fails on the merits.")). So it is hard to see what success Plaintiff achieved.

Defendants point out in opposition to Plaintiff's motion that they dropped their counterclaim in light of the newly decided *Montanile* case, 136 S. Ct. 651, which meant that even though they were successful on the merits, they could only recoup the overpayment via offset, rather than by going after Plaintiff's general assets. (Opp. at 6-7.) Because they could not recover directly from Plaintiff through their counterclaim, and because Plaintiff's third cause of action challenging their right to offset had been dismissed, Defendants could legally recoup the entire amount via offset outside of court. (*See id.*) Defendants do not raise this position for the first time on this motion; rather, they have taken it for years. After Defendants withdrew their counterclaim in 2016, they still requested that the court "issue a determination regarding the amount the Defendants are entitled to recover pursuant to off-set," suggesting Defendants still believed they were entitled to and would recover the offset amount outside of court. (Doc. 88 at 19.) Accordingly, this is not the type of voluntary dismissal contemplated by *Scarangella*, where a court tips its hand in favor of one party in a summary judgment order and that analysis is the impetus for settlement. Here, Defendants won on the merits on Plaintiff's third claim and in nearly every aspect of their counterclaim, and therefore Plaintiff has not achieved some success on the merits of her third claim.

###　B.　*Chambless* Factors

Because Plaintiff achieved some success on the merits on her first cause of action, I may properly grant attorney's fees for her in this case, but I exercise my "discretion to consider five

additional [*Chambless*] factors." *Donachie*, 745 F.3d at 46 (alterations and internal quotation marks omitted).

### 1.     Degree of Defendants' Culpability or Bad Faith

The Second Circuit remanded so that the district court could consider whether the "Fund exhibited at least some degree of culpability in light of its reliance on two psychiatrists who failed to consult with the treating psychiatrist and its failure to comply with ERISA's requirements for explaining its decisions." (2d Cir. Summary Order II at 4.)[4]

"[A] party is only culpable when its conduct is intentional, blameworthy, and results in the breach of a legal duty." *Vangas v. Montefiore Med. Ctr.*, No. 11-CV-6722, 2014 WL 5786720, at *6 (S.D.N.Y. Nov. 5, 2014); *see McPherson v. Emps.' Pension Plan of Am. Re-Ins. Co.*, 33 F.3d 253, 256-57 (3d Cir. 1994) ("In a civil context, culpable conduct is commonly understood to mean conduct that is blameable; censurable; . . . at fault; involving the breach of a legal duty or the commission of a fault. . . . Such conduct normally involves something more than simple negligence. . . . [On the other hand, it] implies that the act or conduct spoken of is reprehensible or wrong, but not that it involves malice or a guilty purpose.") (alterations in original) (internal quotation marks omitted). "A defendant is 'culpable' under *Chambless* where it 'violated ERISA, thereby depriving plaintiffs of rights under a pension plan and violating a Congressional mandate.'" *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 450 (2d Cir. 2006) (quoting *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000)); *see id.* at 451 (appropriate to consider degree to which Defendants failed to engage in fair and open-minded consideration of plaintiff's claim as an indicator of culpability). "Culpability" and "bad faith"

---

[4] Defendants correctly point out that, contrary to the Second Circuit decision suggesting both Dr. Rater and Dr. Anderson failed to consult with Dr. Nicholson, Dr. Rater did communicate with Dr. Nicholson. (*See* Kim. Decl. Ex. 8 at A-53.)

are distinct standards, *id.* at 450, and either will suffice under the first prong of the *Chambless* test, *id.* at 451.

The Second Circuit has instructed that a defendant should be deemed culpable where the plaintiff "was entitled to benefits under the Plan," yet the insurer's "principal reviewer . . . rejected medical conclusions without properly following up with the evaluators," failed to seek "independent evaluations from persons with comparable qualifications," and did not "examin[e] [plaintiff] himself when troubled by the perceived inconsistencies between the medical office files and documents submitted in support of the benefit application." *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 298-99 (2d Cir. 2004). Further, insurers may be found culpable for making "general assumptions" about the plaintiff's condition "rather than [conducting] scientific analysis of medical evidence." *Id.* at 299.

Here, Plaintiff was entitled benefits under the Plan, yet Defendants failed to properly follow up with Plaintiff and her doctors and failed to consider her particular circumstances in the face of compelling medical evidence supporting her claims. For example, Dr. Anthony never spoke with Dr. Nicholson, which is particularly egregious here where, in at least some respects, Dr. Anthony's "expert opinions seem compatible (and supportive) of plaintiff's position and the medical opinions she offers," (SJ Order II at 27), suggesting further follow up was necessary before reaching a conclusion contrary to the findings of Plaintiff's doctors.[5] Moreover, that Dr. Anthony made his recommendation and issued his report knowing he would imminently be able to speak to Dr. Nicholson suggests he had no real interest in learning what Plaintiff's

---

[5] To the extent that Defendants argue that attempting to reach out to a treating physician is a sufficient follow-up effort, that argument is rejected here, where the effort was half-hearted and where Dr. Anthony's conclusion regarding Levine's services was in tension with his general opinions regarding the effectiveness of the treatment Levine was providing.

treating psychiatrist had to say. While Dr. Rater spoke with Dr. Nicholson, Dr. Rater's conclusions, like those of the culpable defendants in *Locher*, were based on generalizations as opposed to medical evidence relating to Plaintiff's particular circumstances. Dr. Rater found that the treatment Levine provided "alone has generally not been found helpful in ameliorating OCD symptoms," but, as Judge Forrest noted, Plaintiff was "not seeking psychotherapy treatment *alone.*" (SJ Order II at 26 (emphasis in original).) Dr. Rater did not weigh whether Levine's services combined with Dr. Nicholson's treatment could be effective for Plaintiff's particular circumstances, even though he acknowledged that those services were helpful in overcoming resistance to treatment, (*see* Kim Decl. Ex. 8 at A-59), and the record that Dr. Rater reviewed was replete with evidence of Plaintiff's resistance, (*id.* Ex. 8 at A-51-A-52, A-54, A-56-A-58). Additionally, Dr. Rater's conclusions referenced only his opinions on psychodynamic psychotherapy *generally*, as opposed to whether the services Levine actually provided were working for Plaintiff. (*See* Kim Decl. Ex. 8 a A-59.) As Judge Forrest noted, Dr. Rater and Dr. Anthony applied general medical principles regarding the success of psychotherapy treatment without considering Plaintiff's "individual circumstances" – circumstances which "suggest[] to the Court that Levine's services may very well be medically necessary as defined by the Plan." (SJ Order II at 25.) Moreover, Defendants failed to provide the required "explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances," (2d Cir. Summary Order I at 3 (internal quotation marks omitted)), which at least suggests Defendants did not prioritize their obligations under ERISA, and at worst suggests Defendants were attempting to shield their expert's findings from Plaintiff to avoid scrutiny. Accordingly, like the defendant in *Locher*, the Defendants rejected well-founded medical conclusions regarding Plaintiff's condition, did not properly follow-up with

Plaintiff's doctors, and improperly relied on general medical observations as opposed to an individualized inquiry, all of which establish that Defendants were culpable for their violation of the Plan.

Defendants' reliance on *Critchlow v. First Unum Life Ins. Co. of Am.*, 377 F. Supp. 2d 337 (W.D.N.Y. 2005), does not require a different result. Defendants argue, citing *Critchlow*, that "[c]ulpability requires more than a dispute over whether benefits should have been granted." (Opp. at 13.) But Defendants fail to comprehend the holding of *Critchlow*. There, the district court denied attorney's fees because "the law was unsettled as to whether autoerotic asphyxiation fell within the type of exclusion at issue," and thus "reasonable minds could have differed as to whether benefits should have been awarded to plaintiff." *Critchlow*, 377 F. Supp. 2d at 344-45. The defendant reached the wrong conclusion after duly considering the evidence in front of it but did not fail to consider medical evidence and did not make improper generalizations. *See id.* To explain this distinction, the *Critchlow* Court distinguished its own facts from *Locher* and explained that a defendant is culpable when it relies on its own experts that reject medical conclusions without properly following up or make "general assumptions" instead of "relying on scientific analysis of medical evidence." *Id.* at 345. Defendants here fall squarely within the explanation of culpability described in *Locher* and recognized in *Critchlow*.

Defendants contend that they have not admitted or been found to have committed any wrongdoing and thus cannot be considered culpable. (Opp. at 13.) But that argument would render the catalyst theory described above moot. The Second Circuit has held that "in evaluating ERISA fee applications, the catalyst theory remains a viable means of showing that judicial action in some way spurred one party to provide another party with relief." *Scarangella*, 731 F.3d at 155. "[C]reat[ing] an extra-statutory rule requiring success be obtained only by court

order," as opposed to through settlement (as here) or voluntary dismissal (as in *Scarangella*), "could have the adverse impact of discouraging settlement where a plan beneficiary is forced to bring potentially expensive litigation in order to obtain the benefits or process rightfully owed to them, only to be denied the right to seek attorney's fees." *Id.* If attorneys cannot recover fees after settling because the opposing party can disclaim any culpable conduct, it would discourage settlement and chill attorneys from bringing ERISA claims on behalf of plaintiffs. Further, such a ruling would conflict with the mandate to construe ERISA's attorney's fee provisions liberally "to protect the statutory purpose of vindicating employee benefits rights." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009) (internal quotation marks omitted).[6] Accordingly, I find that Defendants were culpable, which militates in favor of granting Plaintiff attorney's fees.

### 2. Ability to Pay

While the Defendant has "admitted ability to pay," (2d Cir. Summary Order II at 4), it is only a party's "*inability* to pay an award [that] weighs in its favor," while "its *ability* to pay generally is neutral in effect," *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07-CV-9661, 2009 WL 890626, at *2 (S.D.N.Y. Apr. 2, 2009) (emphasis in original); *see Brown v. Bd. of Trs. of Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp. 2d 434, 447 (E.D.N.Y. 2005) ("[F]indings of ability to pay are neutral."). Accordingly, even though Defendants have the ability to pay, this factor is neutral in the analysis.

---

[6] Defendants argue that the Fund's trustees are not culpable because they have no expertise in psychiatry and reasonably relied on their consultants. (Opp. at 14-15.) That may be an argument for lack of bad faith, but it does not make the Fund any less responsible for its violation of ERISA, even if it is its agents who should have known better. Further, because Fund trustees will rarely be doctors or mental health professionals, finding their lack of expertise to negate culpability would essentially eviscerate that prong of the *Chambless* test.

### 3.    Deterrence

Plaintiff argues that attorney's fees are appropriate here because they will deter future insurers from making improper adverse-benefit determinations and will incentivize funds to improve their procedures to ensure compliance with ERISA.  (Mem. at 13.)  Defendants argue that the award of fees "is not appropriate as a deterrence measure" because their only culpable conduct is "failure to adhere to the new *Halo* strict compliance standard with respect to its adverse benefit determination notice."  (Opp. at 17.)  Defendants' argument misses the mark.  That failure is what prompted *de novo* rather than arbitrary-and-capricious review; it did not dictate or even impact the outcome of that review.  As Judge Forrest stated in her second summary judgment ruling in analyzing the substance of Plaintiff's denial-of-medical-benefits claim, "much of the evidence weighs in favor of [P]laintiff," (2d Cir. Summary Order II at 26), meaning that Plaintiff is not, as Defendant argues, merely "left to allege" procedural violations of ERISA, (*see* Opp. at 17).  In denying Defendants' motion for summary judgment, the court suggested that Defendants unlawfully denied benefits to Plaintiff, (*see id*. at 24-27), and that is just the type of conduct that ought to be deterred by ERISA's fee-shifting provision, *see Slupinski*, 554 F.3d at 47-48.  Indeed, courts have found deterrence appropriate under similar circumstances.  *See Valentine v. Aetna Life Ins. Co.*, No. 14-CV-1752, 2016 WL 4544036, at *6 (E.D.N.Y. Aug. 31, 2016) ("[C]ourts in this circuit have recognized that awarding attorney's fees where the administrator has failed to consider important medical information can serve to deter administrators from engaging in such arbitrary and capricious behavior in the future."); *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F. Supp. 106, 117 (S.D.N.Y. 1994) ("An award of attorney's fees and costs is necessary both to relieve [plaintiff] of the financial burden undertaken to pursue this action, and to deter other employers from similarly denying an

applicant a fair consideration of his or her claim.")[7]

Defendants also argue that they should not be considered culpable for conduct for which they would not have been held liable pre-*Halo*, which is when they made the adverse-benefit determination. (Opp. at 18.) At least one court in this district has adopted Defendants' position, holding that "imposing an award of attorneys' fees would not deter conduct that violates ERISA because [defendant] could not have reasonably predicted the intervening change in law at the time that it processed [plaintiff's] claims." *Hafford v. Aetna Life Ins. Co.*, No. 16-CV-4425, 2017 WL 2774434, at *15 (S.D.N.Y. June 13, 2017), *report and recommendation adopted in part and rejected in part,* 2017 WL 4083580 (S.D.N.Y. Sept. 13, 2017).[8] I am not persuaded. *Halo* rejected the previously used "substantial compliance doctrine," under which certain failures to comply with ERISA's *procedural* requirements did not disqualify a denial of benefits from review under the deferential arbitrary-and-capricious standard. *See Halo v. Yale Health Plan*, 49 F. Supp. 3d 240, 257 n.15 (D. Conn. 2014), ("[W]ith regard to at least some of the ERISA procedural requirements, substantial compliance is sufficient."), *vacated sub nom. Halo*, 819 F.3d 42. Under *Halo*, anything less than strict compliance would prompt *de novo* review. *Halo* 819 F.3d at 60-61. The case did not change insurers' obligations to follow their own plans. Insurers' decisions to deny benefits pre-*Halo* were reviewed under a more deferential standard, but insurers were still presumably required to strictly, not just substantially, comply with the

_____

[7] *Halo* incentivizes plans to comply with procedural rules in order to obtain arbitrary-and-capricious review. A fee award following *de novo* review that resulted from a procedural failure would provide an added incentive. *See Schuman v. Aetna Life Ins. Co.*, No. 15-CV-1006, 2017 WL 2662191, at *6 (D. Conn. June 20, 2017) ("[A]n award of attorneys' fees likely would incentivize the defendants to improve their procedures to avoid violating the regulation in the future.").

[8] The Magistrate Judge's decision was rejected in part, which mooted any discussion of attorney's fees, so the issue was not addressed by the district court.

substantive provisions in their plans. Defendants have not provided any support for their position that *Halo* changed insurers' substantive obligations. Thus, imposition of fees would still have the effect of deterring decisions that violate plan provisions, even if these decisions are just wrong, rather than arbitrary and capricious. *Hafford*'s reasoning suggests that plans should not strive for substantively correct decisions, just ones that will survive arbitrary-and-capricious review. It also devalues the strict compliance with procedural requirements that animated the decision in *Halo*. Further, in *Hafford*, the Magistrate Judge found that the defendants' decision to hear the plaintiff's untimely appeal of an adverse-benefit determination was discretionary (meaning the defendant could have denied the appeal on its face), but because the defendant heard the appeal, its failure to strictly comply with ERISA's procedural regulations meant its decision was reviewed *de novo* rather than deferentially. *Hafford*, 2017 WL 2774434, at *10. The court found that defendant's willingness to consider plaintiff's appeal at all was "a strong indication of the [defendant's] good faith and lack of culpability in regards to the procedures it followed." *Id.* at *5. No analogous facts are present here.

Accordingly, fees here would deter future improper adverse-benefit determinations and encourage strict procedural compliance, and thus the third *Chambless* factor supports a fee award.

### 4.    Relative Merits of the Parties' Positions

As laid out above, the Court finds that Plaintiff achieved some success on the merits of her first claim to the extent the Fund made an adverse-benefit determination regarding Levine's treatment. Even though Plaintiff's success came via settlement, Judge Forrest made clear that the evidence favored Plaintiff's position on that claim. (SJ Order II at 3, 17, 24, 26.) Plaintiff did not, however, achieve success on the remainder of her claims, which she admits with regard to the Dr. Nicholson portion of her first claim and with regard to her second, fourth, and fifth

claims, and which the Court discussed above with regard to her third claim and Defendants' counterclaim. Therefore, the relative merits of the parties' positions favor granting attorney's fees to Plaintiff on the Levine portion of her first claim but not on the Dr. Nicholson portion of that claim or on claims two through five.

5.     <u>Whether the Action Conferred a Common Benefit on a Group of Pension Plan Participants</u>

"Because this case is brought only on behalf of a single plaintiff seeking disability benefits, the fifth factor of common benefit on a group of pension plan participants is not met here." *Nelson v. Unum Life Ins. Co. of Am.*, No. 03-CV-36247, 2006 WL 3196927, at *2 (E.D.N.Y. Nov. 3, 2006). "Regardless of this deficiency, 'failure to satisfy the fifth *Chambless* factor does not preclude an award of attorneys' fees.'" *Id.* (quoting *Locher*, 389 F.3d at 299).[9] But this factor does not support an award of fees.

Considering all five *Chambless* factors, three of which favor Plaintiff's position, and because Plaintiff achieved some success on the merits, Plaintiff is entitled to attorney's fees.

**C.  Appropriate Attorney's Fees and Costs**

Plaintiff seeks attorney's fees of $501,652.50 and costs of $10,781.65, for a total of $512,434.15. (Mem. at 17.)[10] Defendants argue that Plaintiff's requested fees are excessive because Plaintiff lost "90% of the action," Plaintiff's counsel expended too many hours

---

[9] Plaintiff's only argument on this *Chambless* factor is that a benefit will be conferred on a group of pension plan participants because insurers will be deterred from terminating benefits without reason. (Mem. at 16-17.) This argument goes to deterrence and does not belong in the analysis regarding whether Plaintiff's claim will confer a benefit on a group.

[10] Plaintiff's figures suffer from basic errors. First, in the Weinstein Declaration (Doc. 127 ("Weinstein Decl.")), Plaintiff states that the fees appearing on Exhibit A equal $510,193.50, but the fees listed in Exhibit A are $491,734.50, (*id.* Ex. A at 32). Second, Plaintiff's counsel adds $510,193.50 and $18,639, and then subtracts $8,541, (*id.* ¶ 13), which should have resulted in a total of $520,291.50, but Plaintiff erroneously calculated it to be $501,652.50, (*id.*).

preparing the complaint and summary judgment motion, and this was the first ERISA action for two of the three main attorneys.  (Opp. at 23-24.)

The Second Circuit and the Supreme Court have both held that when analyzing requests for attorney's fees, "the lodestar – the product of a reasonable hourly rate and the reasonable number of hours required by the case – creates a 'presumptively reasonable fee.'"  *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)).  "[I]n calculating the presumptively reasonable fee," courts must

> bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate.  The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively.

*Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks and emphasis omitted).  "A detailed explanation of the lodestar calculation is unnecessary, but compliance with the Supreme Court's directive that fee award calculations be 'objective and reviewable,' implies the district court should at least provide the number of hours and hourly rate it used to produce the lodestar figure."  *Millea*, 658 F.3d at 166-67 (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010)).  Further, "the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials."  *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006).

Plaintiff reached the lodestar figure by calculating that Peter B. Cohen worked 150 hours at $450 an hour, Yong Hak Kim worked 673 hours at $420 an hour, and Eric Weinstein worked 323.3 hours at $495 an hour.  (Weinstein Decl. Ex. A at 32; *id.* Ex. B at 2-3.)  I find that these hourly rates are reasonable based on my own knowledge of comparable rates charged by lawyers in this district and evidence provided by Plaintiff's counsel.  *See Demonchaux v.*

*Unitedhealthcare Oxford*, No. 10-CV-4491, 2014 WL 1273772, at *7 (S.D.N.Y. Mar. 27, 2014)

(finding $500 to be a reasonable hourly rate in ERISA case and collecting cases). Further,

Plaintiff submitted a declaration from Eric Weinstein, which included exhibits of

contemporaneous time records kept by Plaintiff's counsel, which Defendants do not argue are

inaccurate or vague.[11] Defendants assert that the number of hours Plaintiff's counsel billed are

excessive. They do not specify particular entries in Plaintiff's counsel's time records that were

unnecessary or took an excessive amount of time to complete, but allege that the overall time

spent both pre- and post-complaint was unreasonable. A review of the records reveals some

excessive hours. For instance, the 118.2 hours Plaintiff spent working on the original complaint

– the equivalent of three weeks of full-time work – including 47.9 hours on drafting alone, is

unreasonable. *See HVT, Inc. v. Port Auth. of N.Y. & N.J.*, No. 15-CV-5867, 2018 WL 6079932,

at *6 (E.D.N.Y. Nov. 21, 2018) (finding 97.1 hours spent on pre-filing work, strategizing and

preparing the pleadings excessive, and reducing those hours by nearly half). Perhaps because

---

[11] Plaintiff utilized "block-billing" for multiple time entries. "Block-billing, the practice of aggregating multiple tasks into one billing entry, is not prohibited," but it "can make it exceedingly difficult for courts to assess the reasonableness of the hours billed." *LV v. N.Y.C. Dep't of Educ.*, 700 F. Supp. 2d 510, 525 (S.D.NY. 2010) (internal quotation marks omitted). Although block-billing is generally disfavored, "it is most problematic where large amounts of time (*e.g.*, five hours or more) are block billed, thereby meaningfully cloud[ing] a reviewer's ability to determine the projects on which significant legal hours were spent." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, No. 07-CV-6304, 2016 WL 3030253, at *6 (S.D.N.Y. May 25, 2016) (alteration in original) (internal quotation marks omitted). Defendants do not argue for a reduction due to block-billing. The Court's review of Plaintiff's time records show that Plaintiff's counsel billed more than five hours fifteen times, but fourteen of those entries were not block-billed, and the fifteenth entry, (Weinstein Decl. Ex. A at 4), "contain[s] sufficient detail and specificity so as to afford reasonable confidence that the time billed was productively spent, even if it is impossible to reconstruct the precise amounts of time allocable to each specific task listed in the block entry," *Congregation Rabbinical Coll. of Tartikov*, 2016 WL 3030253, at *6. The remaining entries are well under five hours and sufficiently detailed. A reduction is therefore not warranted because of Plaintiff's use of block-billing.

this case was the first ERISA litigation for two of the three attorneys on Plaintiff's team, (Opp. at 24), the record shows hours researching foundational ERISA provisions, (*see, e.g.*, Weinstein Decl. Ex A. at 1 (1.2 hours reviewing ERISA's enforcement provisions); *id.* Ex. A at 4 (3.4 hours reviewing, among other things, ERISA's claim procedures); *id.* Ex. B at 1 (2 hours researching distinction between bad faith and culpability)). Legal research is obviously appropriate, but Defendants should not have to compensate Plaintiff's counsel for time spent achieving basic competence. Moreover, the records are replete with entries for conferences among Plaintiff's three attorneys. *See Tucker v. City of N.Y.*, 704 F. Supp. 2d 347, 355-57 (S.D.N.Y. 2010) (imposing percentage reduction where records reflected "vast number of communications with others, mainly other attorneys, with no little or no explanation of the subject of the communications, much less their necessity"); *see also id.* at 355 (nothing inherently wrong with staffing case with two or more attorneys if scope of case justifies it, but otherwise it risks duplication and overstaffing).

Across-the-board percentage reductions are appropriate to trim the fat from excessive fee applications. *Greene v. City of N.Y.*, No. 12-CV-6427, 2013 WL 5797121, at *6 & n.60-61 (S.D.N.Y. Oct. 25, 2013) (collecting cases). I will therefore reduce the number of compensable hours by 25%, entitling Peter B. Cohen to 112.5 hours of compensable time, Yong Hak Kim to 504.75 hours, and Eric Weinstein to 242.48 hours.

Plaintiff's counsel acknowledge that they are seeking a fee award that is far greater than Plaintiff's recovery through settlement (33.5 times more as calculated by the Court), but they argue that "there is no rule requiring proportionality between the fees requested and the amount recovered" in ERISA cases. (*See* Mem. at 17-18.) Plaintiff next seemingly argues that because she did not pursue her second, fourth, and fifth claims, she should not be considered to have lost

those claims, but in any event, Plaintiff attempted to discount any hours worked only on those claims from its motion for fees. (*See id.* at 18.) Further, Plaintiff alleges that the "overwhelming majority" of this case focused on the first and third claims, claims upon which she "achieved some success," and therefore no discount is warranted. (*Id.* at 19.)

Plaintiff is correct that a reasonable attorney's fee need not be proportional to the recovery obtained by Plaintiff in ERISA actions. *See Kindle v. Dejana*, 308 F. Supp. 3d 698, 709 (E.D.N.Y. 2018) (collecting cases). Plaintiff mischaracterizes, however, her success in this case. A plaintiff who achieves "only partial or limited success" may not be entitled to "full compensation for attorneys' fees" and "courts are permitted to reduce the award to account for the limited success." *Verdier v. Thalle Constr. Co., Inc.*, No. 14-CV-4436, 2018 WL 1136615, at *3 (S.D.N.Y. Mar. 1, 2018) (internal quotation marks omitted). Plaintiff was unsuccessful on the majority of her claims, including on some issues that she herself identifies as the "overwhelming majority of the case . . . : medical necessity and overpayments." (Mem. at 19.) Plaintiff did not win the overpayment issue – *i.e.*, her third cause of action and Defendants' counterclaim – and lost half of her medical necessity claim as she was denied any relief regarding Dr. Nicholson's services. Defendants argue that Plaintiff only "won" her medical necessity claim to the extent that Defendant agreed to pay her $15,300 to cover past visits to Levine as well as up to two visits per week for sixteen weeks moving forward, subject to the same renewal process as her visits with Dr. Nicholson, the exact arrangement to which she objected in her first cause of action as to Dr. Nicholson. (Opp. at 9-10; *see* FAC ¶ 65 ("The Fund's determination that Dr. Nicholson's charges past the 16-week period would be excluded in the absence of prior approval violates the Plan's requirements concerning medical necessity.")); *see Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) ("Both the

quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved."). But Plaintiff's agreement to settle for a remedy with regard to Levine that she regarded as insufficient with regard to Dr. Nicholson does not mean she did not achieve success; indeed, she plainly did succeed in reversing the Fund's determination that it would not pay anything for Levine.

Keeping in mind the remedial nature of ERISA, the fact that the fee-shifting provision was enacted to encourage plaintiffs and law firms to bring these suits, and Plaintiff's limited success on the merits, I will award Plaintiff's attorney's fees, but reduce them. Because Plaintiff correctly suggests that this litigation was overwhelmingly focused on the first and third claims, I will impose reductions relating to those claims. Plaintiff's counsel has already subtracted $8,541 from its fee application regarding services performed solely in furtherance of Plaintiff's unsuccessful second, fourth, and fifth claims, so no further reduction is necessary in connection with these claims.

I will account for Plaintiff's failure on her third claim and Defendants' counterclaim with a 50% reduction. On the first claim, Plaintiff succeeded in showing medical necessity for Levine's services and failed in challenging the requirement that Dr. Nicholson's services be reviewed after 16 weeks. Based on the parties' submissions and the Court's rulings, the former was the more complex and contested issue. Accordingly, rather than impose a 50% reduction on the remaining half, I will impose a 33.3% reduction. Multiplying the reasonable hours expended by Plaintiff's counsel – 112.5 for Mr. Cohen, 504.75 for Mr. Kim, and 242.48 for Mr. Weinstein – by each lawyer's hourly fee, results in a total of $382,647.60. Reducing those fees by 50% and then 33.3%, Plaintiff is entitled to $127,612.97 in fees.

With regard to costs, Plaintiff seeks to double-charge Defendants. Exhibits A and B of the Weinstein Declaration list both fees and costs, which Plaintiff relies on to calculate the total *fees* owed. (*See* Weinstein Decl. at 5; *id.* Ex. A at 32; *id.* Ex. B at 3.) Plaintiff then adds those costs back in again to get the final number it requests in its motion. (Mem. at 17; *see* Weinstein Decl. at 5.) In any event, I am not relying on the calculations Plaintiff provided, so her mathematical errors can be disregarded. Plaintiff has documented costs of $10,81.65, and Defendants have not challenged them.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Attorney's Fees is GRANTED to the extent set forth above, and Plaintiff is entitled to $127,612.97 in fees and $10,781.65 in costs. The Clerk of the Court is respectfully directed to enter judgment for Plaintiff in the amount of $138,394.6246, terminate the pending motion, (Doc. 125), and close the case.

**SO ORDERED.**

Dated: January 9, 2019
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.